IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01548-WYD

ERIN ELLIOTT on behalf of
WILLIAM ELLIOTT, deceased

 Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

 Defendant.

**ORDER**

THIS MATTER is before the Court on review of the Commissioner's decision that denied William Elliott's claim for disability insurance benefits.  For the reasons stated below, this case is reversed and remanded for further fact finding.

I. INTRODUCTION AND BACKGROUND

William Elliott [hereinafter "Mr. Elliott"], born in October 1973, was 28 years old on March 31, 2002, the date he alleged that he became disabled.  (Transcript ["Tr."] 143.)  He obtained a general equivalency degree ["GED"] and had past relevant work experience installing windshields.  (*Id.* 149, 153.)

Mr. Elliott filed his application for disability benefits in March 2006 alleging that he became disabled on March 31, 2002, due to a neurological disease.  (Tr. 143-44, 148.)

Specifically, it is alleged that Mr. Elliott had focal amyotrophy.[1]  As of October 2002, just shortly after Mr. Elliott's date last insured of September 30, 2002, a physical therapist indicated that the condition appeared to primarily affect Mr. Elliot's left arm and shoulder and right leg.  The condition progressed over time and, by 2007, involved both upper extremities and his right leg.  (Tr. 225.)

Mr. Elliott's application was denied at the initial determination stage.  (Tr. 27, 258.)  A hearing was held before an ALJ on December 3, 2007.  (*Id.* 334-58.)  The ALJ concluded in a decision dated January 20, 2009, that Mr. Elliott was not disabled because his medically determinable impairment was not severe.  (*Id.* 28B.)

Mr. Elliott passed away on July 26, 2008, prior to the ALJ's decision.  His death occurred when he fell off a boat and drowned.  Plaintiff asserts that Mr. Elliott drowned because he had insufficient muscle strength to save himself when he fell off the boat.  (*See* Pl.'s Opening Brief at 6.).  The reason for his death is, however, immaterial to resolution of this case as it occurred almost six years after his date last insured.  Mr. Elliott's wife was properly substituted at the administrative level as a party who would be adversely affected were the action dismissed.  The Appeals Council

---

[1]  Plaintiff explains that "focal amyotrophy" is a motor neuron disease.  According to the National Institute of Neurological Diseases, the motor neuron diseases ["MNDs"] are a group of progressive neurological disorders that destroy motor neurons, the cells that control essential voluntary muscle activity such as speaking, walking, breathing, and swallowing.  Normally, messages from nerve cells in the brain (called *upper motor neurons*) are transmitted to nerve cells in the brain stem and spinal cord (called *lower motor neurons*) and from them to particular muscles.  Upper motor neurons direct the lower motor neurons to produce movements such as walking or chewing.  Lower motor neurons control movement in the arms, legs, chest, face, throat, and tongue.  When there are disruptions in these signals, the muscles do not work properly; the result can be gradual weakening, wasting away, and uncontrollable twitching (called fasciculations).  Eventually, the ability to control voluntary movement can be lost.  http://www.ninds. nih.gov/disorders/motor_neuron_diseases/detail_motor_neuron_diseases.htm#138743144.

substituted Mrs. Elliott as the claimant, accepted review, and remanded the case to the ALJ for further evaluation. (Tr. 28B-28D.)

An ALJ held a subsequent hearing on July 27, 2009 (Tr. 359-81). A decision was issued on December 1, 2009, in which the ALJ concluded that Mr. Elliott was not disabled under the Act at step five because other work existed in the national economy that he could perform. (Tr. 14-25.)

More specifically, under the sequential evaluation required by law, the ALJ found at step one that Mr. Elliott had not engaged in substantial gainful activity from his alleged onset date, March 31, 2002, through the expiration of his disability insurance (date last insured or "DLI") of September 30, 2002. (Tr. 21, Finding 2.) He determined at step two that Mr. Elliott's focal amyotrophy was a "severe" impairment. (*Id.*, Finding 3.) At step three, the ALJ found that Mr. Elliott's impairment did not meet or equal Listing 11.00 in 20 C.F.R pt. 404, subpt. P, app. 1. (*Id.*, Finding 4.)

The ALJ next considered Mr. Elliott's symptoms and alleged limitations. (Tr. 22-23.) Following the two-step pain analysis, the ALJ determined that Mr. Elliott's statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the residual functional capacity ["RFC"] assessment. (*Id.* 22.) He also determined that Mr. Elliott retained the RFC to perform less than the full range of light work. (*Id.* 21-22.) Specifically, the ALJ found that Mr. Elliott could lift and carry 20 pounds occasionally, 10 pounds frequently; sit, stand, walk for six hours in an eight-hour workday; occasionally push and pull with the upper extremities; occasional use of the lower extremities; not climb ladders, ropes

or scaffolds; occasionally climb ramps and stairs, balance, stoop, crouch, and crawl; and occasionally reach, handle, and finger on the left. (*Id.*, Finding 5.)

At step four, the ALJ found that Mr. Elliott's RFC precluded him from performing his past work as an auto glass installer. (Tr. 23, Finding 6.) However, he found at step five that Mr. Elliott could perform other work that existed in significant numbers in the national economy. (*Id.* 24, Finding 10). This included work as a "call-out operator," "counter clerk photo finisher," and "furniture rental consultant". (*Id.* 24-25.) As such, the ALJ found that Mr. Elliott was not disabled under the Act. (*Id.* 25, Finding 11.)

The Appeals Council declined review on May 26, 2010. (Tr. 8-10). This appeal followed. This Court has jurisdiction to review the decision pursuant to 42 U.S.C. § 405(g).

Plaintiff argues that the ALJ failed to base his step three finding in substantial evidence by failing to consider all the applicable Listings involving neurologically based muscle atrophy and by failing to consult a medical expert on the issue of whether Mr. Elliott's impairments equaled any Listing. She also argues that the ALJ's RFC and credibility assessments are not supported by substantial evidence. I address these arguments below.

II.  ANALYSIS

   A.  Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and*

*Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992).  Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion.  *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).  "It requires more than a scintilla of evidence but less than a preponderance of the evidence."  *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

  B. <u>Whether the ALJ's Decision is Supported by Substantial Evidence</u>

    1. <u>Whether the ALJ Erred at Step Three</u>

Step three requires a finding of disability when the claimant has an impairment that "meets or equals" one of the impairments listed at 20 C.F.R. §404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §404.1520(a)(4)(iii).  An ALJ is required "to discuss the evidence and explain why he found that [a claimant] was not disabled at step three."  *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1997).  The claimant must point to objective medical evidence in the record that supports a finding that he or she meets a listing.  *See Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988).

Plaintiff asserts that three Listings are relevant to the impairments involving Mr. Elliott's neurological condition, consisting of muscle atrophy caused by problems with the nerves that serve particular muscles—Listings 1.04A, 11.00(C), and 14.04.

She further asserts that while her husband's impairment may not have precisely met the requirements of all these Listings, there was substantial evidence that implicated all three Listings and that a medical expert should have been retained.  Plaintiff also argues that the ALJ erred in considering only whether Mr. Elliott's impairment met or equaled one listing, Listing 11.00(C), and not the other two relevant Listings.

I first address Listing 11.00(C), the only Listing considered by the ALJ.  The ALJ found that Mr. Elliott's impairment did not meet or equal this Listing because he had "the use of his fingers, hands, and arms during the period at issue."  (Tr. 21.)  The period at issue as referenced in the ALJ's statement is the period from March 31, 2002 through September 30, 2002.  The Commissioner did not specifically address in his response the adequacy of the ALJ's consideration of this Listing.  I agree with Plaintiff that the ALJ erred at step three in connection with his consideration of Listing 11.00(C).

I first find that the ALJ erred as he did not consider probative evidence on the issue of whether Mr. Elliott met the Listing.  The Tenth Circuit has made clear that although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is 'significantly probative.'"  *Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) (quoting *Clifton,* 79 F.3d at 1009-1010).  Further, "[t]he ALJ must evaluate 'all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation.'"  *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (quoting 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)).  This is particularly true in this case since

the Commissioner concedes that evidence of record for the relevant time period is sparse. (*See* Def.'s Resp. Br. at 19).

The evidence that the ALJ failed to properly consider is the opinion of Liza Blom, a physical therapist, issued on October 23, 2002, only 23 days after the expiration of this period. Ms. Blom described Mr. Elliott's extensive difficulty with the use of his left upper extremity and his problems maintaining his balance given the atrophy in his quadriceps muscle. (Tr. 201.) She opined that Mr. Elliott has limited ability to raise his arm overhead independently and to turn his wrist outward. (*Id.*) She also opined that "[t]his has led to his inability to maintain his humerous bone in his shoulder socket." (*Id*). She referenced the fact that Mr. Elliott had difficulty even getting his left arm on the steering wheel after physical therapy sessions. (*Id.*) She further opined that the muscle atrophy in Mr. Elliott's right leg resulted in an inability to tolerate repeated resistance" and that in therapy, Mr. Elliott's right calf muscle failed to support body weight after certain exercises. (*Id.*) Ms. Blom concluded from her evaluation that "the disruption to Mr. Elliott's neuromuscular system . . .limit[s] the type of work and activities that he is able to perform as in the examples given above." (*Id.*)

Ms. Blom's observations are supported by her notes, which extend in time from June 25, 2002 – October 23, 2002, during the period at issue. (*Id.* 202-13.) Further, Ms. Blom's report makes it apparent that the evaluation which forms the basis for her opinions occurred in July and August, also during the relevant time period. The ALJ briefly mentions only parts of Ms. Blom's report (*Id.* 23), *i.e.*, only some of her statements regarding Plaintiff's upper extremity and none regarding his leg, and does

not discuss Ms. Blom's report at all in connection with his step three findings. The ALJ's selective application of Ms. Blom's report is improper. *Carpenter*, 537 F.3d at 1265. This evidence supports Plaintiff's contention that Mr. Elliot did not have meaningful use of this left upper extremity during the period at issue and was directly relevant to whether Mr. Elliott had the use of arms during the period. This was probative evidence directly relevant to whether Plaintiff met the Listing. The ALJ's failure to properly consider this evidence requires a remand.

Further, Listing 11.00(C) requires consideration, not only of the problems with the use of fingers, hands, and arms, but also the degree of interference with locomotion. I agree with Plaintiff that the ALJ did not give any consideration to Mr. Elliott's lower extremity problem when doing the step three assessment. This also is error which requires a remand for the issue to be properly addressed.

Further, Ms. Blom's opinion is relevant, even though dated shortly after the expiration of Mr. Elliott's insured status. First, the report states that it was based on an evaluation within the relevant time period. Second, the Tenth Circuit has stated that "evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date or may identify additional impairments which could reasonably be presumed to remanded so that this evidence can be properly considered and weighed." *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479 (10th Cir. 1993).

I now turn to the Listings that the ALJ did not consider in his decision. The issue is whether Mr. Elliott's impairments are medically equivalent to these Listings since Plaintiff concedes that her husband's impairments did not precisely meet the requirements of the Listings. An impairment(s) is medically equivalent to a listed impairment . . .if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 1526(a). The ALJ can find medical equivalence in three ways:  (1) the impairment(s) is described in appendix 1, but the claimant does not exhibit all of the findings or he exhibits all the findings, but one or more is not as severe as specified in the particular listing; (2) the impairment(s) is not described in appendix 1, but the findings related to the impairment are at least of equal medical significance to a listed impairment; or (3) the findings related to a combination of impairments are at least of equal medical significance to a listed impairment. 20 C.F.R. § 404.1526(b). The determination of medical equivalence is based on the medical findings. *Puckett v. Chater*, 100 F.3d 730, 733 (10th Cir. 1996).

It is undisputed that the ALJ gave no consideration to the issue of whether Mr. Elliott's impairment met or equaled Listing 1.04A. This Listing requires that there be a disorder of the spine resulting in compromise of a nerve root that results in "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (*atrophy with associated muscle weakness*…) accompanied by sensory or reflex loss…." *Id*. (emphasis added). While Mr. Elliott's condition did not precisely meet this Listing, in that his motor loss, muscle atrophy, limitation of motion, and reflex loss were not caused by a specific nerve root

compression, Plaintiff argues that the EMG evidence obtained in 2000 at University Hospital resulted in findings consistent with motor neuropathy or cervical radiculopathy affecting the left C5-6 myotomes. (Tr. 236.)

The ALJ also did not consider Listing 14.04(B)(3-4). That Listing requires a diagnosis of systemic sclerosis or scleroderma, which Mr. Elliott did not have. However, Plaintiff argues that the ALJ should have considered whether Mr. Elliott had a condition that was functionally equivalent to this Listing. Scleroderma can be severe enough to cause disability because it can cause functional limitations resulting from muscle atrophy and irreversible damage in either or both upper extremities (subparagraph B3) or the lower extremities (subparagraph B4). In Mr. Elliott's case, he had muscle atrophy and irreversible damage in one upper and one lower extremity.

I find that the ALJ erred in not considering these Listings and in failing to obtain the opinion of a medical expert on the issue of whether Mr. Elliott's impairments were medical equivalent to these Listings. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart,* 381 F.3d 664, 670-671 (7th Cir. 2004) (citing 20 C.F.R. § 404.1526(b)); *see also* SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996) ("longstanding policy requires that the judgment of a physician. . . designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and given appropriate weight.")

The Commissioner asserts that medical equivalence was properly considered by a medical expert based on the fact that SSA 832-U5 forms were completed in the case.

It is true that "[t]he signature of a State agency medical. . .consultant on [such a form] ensures that consideration by a physician … designated by the Commissioner has been given the question of medical equivalence." SSR 96-6p, 1996 WL 374180, at *3. However, I find that the SSA 832-U5 forms in this case did not constitute a medical opinion on the issue of functional equivalence.

As noted by Plaintiff, the first SSA form was filled out in connection with Mr. Elliott's prior claim filed in 2003. (Tr. 258-59.) The form was signed by a single decision maker ["SDM"] who is not a medical professional and whose opinion is thus not entitled to weight. *See Klobas v. Astrue*, No. 08-cv-02324-REB, 2010 WL 383141, at *5 (D. Colo. Jan. 29, 2010) (unpublished); *Cunningham v. Astrue*, No. 09-2535-SAC, 2010 WL 4737795, at *4 (D. Kan. Nov. 16, 2010) (unpublished). On that form, the SDM made a note, "refer to RFC by Dr. Dyde dated 4/4/03." (Tr. 258.) In fact, the RFC form dated April 4, 2003 is signed by Dr. Ketelhohn, not Dr. Dyde. (*Id.* 317-324.)

Nonetheless, the SDM asked Dr. Ketelhohn whether Mr. Elliott's impairments could meet a listing. (Tr. 325.) The issue of medical equivalence was not specifically asked about. (*Id.*) If Dr. Ketelhohn responded to the SDM's question by addressing medical equivalence, this would obviously constitute a proper medical opinion on the issue. Dr. Ketelhohn responded, however, only by referring to the RFC form he filled out as to Mr. Elliott's impairments. (*Id.*) The Commissioner asserts that Dr. Ketelhohn effectively answered the SDM's question in his RFC finding when he found that Mr. Elliott retained the ability to perform a reduced range of light work. (*Id.* 318). I disagree. The RFC form addresses the issue of Mr. Elliott's limitations from his

impairments, not whether his impairment meets or equals a Listing. Any interpretation of the RFC to determine how it meets or equals a Listing would require a medical judgment that Dr. Ketelhohn did not make. Thus, the first SSA 832 form did not comply with the Commissioner's obligation to have a medical expert opinion on the issue of equivalence.

A SSA 832-U5 form was again completed in the course of Mr. Elliott's second claim filed in 2006. (Tr. 27-28.) On this form, dated April 20, 2006, no medical expert is referred to or cited. Therefore, this form also cannot provide support for the ALJ's finding on medical equivalence.

I also agree with Plaintiff that at the time Dr. Ketelhohn reviewed the file and completed the RFC form, the file was incomplete. The medical records in the file at that time (marked as exhibits beginning with "PF" in the record) consisted solely of the records dated December 10, 2002 – January 7, 2003 from Dr. Treihaft. There was extensive medical evidence added to the file in between the time of Dr. Ketelhohn's assessment in 2003 and the ALJ's decision in 2009; namely, the evidence from Ms. Blom, University Hospital, Dr. Nay, and the updated records from Dr. Treihaft. Exhibit 10F is particularly significant in that it contains the results of objective diagnostic testing performed well before the expiration of Mr. Elliott's insured status. Whether there is objective evidence of neurological damage is a key question in determining whether a claimant meets or equals the Listings at issue.

SSR 96-6p indicates that the opinions of State agency medical experts are to be given weight because they are opinions of experts who have access to the complete

file. That is not the situation here, since the file in 2003 did not contain all the relevant evidence as to whether Mr. Elliott met or equaled a Listing. This provides another reason the SSA-832-U5 from the 2003 claim can not be relied on in determining whether Mr. Elliott's impairments met or equaled a Listing. Thus, even if Dr. Ketelhohn's RFC had answered the question of medical equivalence in 2003, there was evidence in the file that Dr. Ketelhohn had not considered relevant to the equivalence issue. I find that this evidence required that a medical expert be brought in by the ALJ in 2009. While the Commissioner argues that whether to ask for a medical expert based on new evidence is left to discretion of the ALJ under SSR 96-6p, I find an abuse of discretion in not seeking a medical expert under the circumstances of this case since there is not substantial evidence to support the medical equivalence finding. *See Cannon v. Astrue*, No. 4:08-CV-160-D, 2010 WL 902485, at *11 (E.D.N.C. 2010) (March 11, 2010) (unpublished) (holding that updated medical opinion is not required where the determination of the ALJ that the additional medical evidence would not change the finding on medical equivalence is supported by substantial evidence); *see also Birnell v. Apfel*, 45 F. Supp. 2d 826, 837 (D. Kan. 1999) ("When significant new evidence regarding the . . . health of a claimant arises at the hearing level, the ALJ should procure the assistance of a medical advisor. . .").

Based on the foregoing, I find that this case must be remanded at step three. The ALJ must consider whether Mr. Elliott's impairments met or equaled Listing 11.00(C) as well as whether the impairments were medically equivalent to Listings 1.01A and 14.04(B)(3-4) based on all the evidence. The ALJ must obtain a medical

expert to opine on the issue of medical equivalence.  In so finding, I reject the Commissioner's argument that any error at step three is harmless.  The ALJ's failure to conduct a proper step three analysis may well have changed the outcome of the case.

2. <u>Whether the RFC Finding was Supported by Substantial Evidence</u>

Plaintiff also argues that the ALJ's finding that Mr. Elliott could have done "occasional" reaching or handling with his left upper extremity is not supported by substantial evidence.  I find that this issue also must be reassessed on remand, given the fact that the ALJ did not properly weigh Ms. Blom's opinion as discussed in the previous section.  Ms. Blom refers to the extensive description of the atrophy and weakness in Mr. Elliott's left shoulder and arm.  (Tr. 201.)  She described Mr. Elliott's inability to reach overhead "independently," meaning that he would have to use his other arm to assist that maneuver.  She stated that the wasting in Mr. Elliott's muscles was also so severe that he risked dislocating his shoulder with simple movements.  (*Id.*)

In considering this issue on remand, the ALJ must also properly consider and weigh Mrs. Elliott's testimony.  She described how, during Mr. Elliott's brother's wedding in July 2001, she and the brother had to help Mr. Elliott dress because he could not fasten the buttons on his tuxedo.  She also related how, in a photograph from that event showing Mr. Elliott's arm on his brother's shoulder, his brother had to lift his arm up enough to put it there.  (Tr. 363.)  Plaintiff also described how Mr. Elliott's gait was so unsteady that he fell during the wedding reception.  (*Id.* 364.)  Further, she described how, after November 2001, Mr. Elliott could no longer go hunting because he could not lift the gun and hold it.  (*Id.* 365.)  She also testified how he could not lift anything past

the middle of his body. (*Id.* 366.) She described how his shoulder was bone on bone, just a lump without muscles, and that he had pain down his back, as well as tingling in his hands in the 2001-2002 time period. (*Id.* 370.) During that time, she stated that he also had problems walking and had difficulty sleeping. (*Id.* 371-372.)

Mrs. Elliott's testimony, as well as the objective observations of the physical therapist based on an evaluation of Mr. Elliott during the relevant time frame, indicate that Mr. Elliott could barely use his left arm at all. Given that, the ALJ's finding that Mr. Elliott could occasionally reach or handle with his left upper extremity in a work situation, that is, for up to one-third of the workday, seems extremely suspect. This evidence also indicates that Mr. Elliott's ability to walk and stand was significantly compromised. The ALJ did not give any reason to discount the evidence from either the physical therapist or Mrs. Elliott, and this must be adequately addressed on remand, since it directly contradicts his RFC finding.

As noted previously, while ALJ need not discuss every piece of evidence before him, he must discuss substantial evidence such as this testimony from Mrs. Elliott and the observations of the physical therapist. An ALJ's decision is not supportable if he does not discuss the significant, otherwise probative evidence that he does not rely on in evaluating the claim. *Frantz v. Astrue*, 509 F.3d 1299, 1303 (10th Cir. 2007).

       3.     <u>Whether the Credibility Assessment s Supported by Substantial Evidence</u>

Finally, Plaintiff argues that the factors cited by the ALJ are insufficient to support his finding that Mr. Elliott's allegations of the intensity, persistence, and limiting effects

of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 22.)  I note that credibility determinations are peculiarly the province of the finder of fact, and will not generally be upset by the court.  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995).  "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'"  *Id.* (quotations omitted).

As support for his finding that Plaintiff was not fully credible, the ALJ cited the fact that Mr. Elliott did not take any medications for muscle cramping or pain.  (*Id.*)  However, Plaintiff points out that the record indicates that Mr. Elliott's physicians repeatedly told him there was no medication to treat his disorder.  Accordingly, this cannot be used as a basis to find Mr. Elliott not credible.

The ALJ also states that in Exhibit 6E (Disability Report – Appeal, Tr. 166-170) Mr. Elliott indicated that his problems with bathing, dressing, and cutting food developed "well after Sept 2002." (Tr. 22.)  In fact, Exhibit 6E says nothing of the sort.  The other exhibit the ALJ cites in that same paragraph (Exhibit 2E, Tr. 148-154) also  does not support his finding that Mr. Elliott's difficulties developed "well after Sept 2002".

The ALJ further states that Mr. Elliott testified that his leg did not start to give out on him until 2004 (2 years after the expiration of Mr. Elliott's insured status).  (Tr. 23.)  In fact, Mr. Elliott initially testified that his leg "came along" in 2004, but "maybe a little earlier" and in his next sentence stated that it was actually "starting to go" in 2002.  (Tr. 348).  The ALJ may not selectively pick out testimony that supports his credibility finding while ignoring other relevant testimony that does not.  *See Carpenter*, 537 F.3d at 1265.

The medical evidence supports the 2002 date as well, including the extensive description of Mr. Elliott's lower extremity problems in the observations of both physical therapist Liza Blom, MPT (Tr. 201) and Dr. Treihaft (*id.* 250-252) in 2002.

Finally, the ALJ referred to Mr. Elliott's household activities and the fact that he took care of his children. However, the ALJ again selectively applied the evidence on that issue, ignoring the limitations that Mr. Elliott testified to. (Tr. 354-55.) Further, the fact that Mr. Elliott took care of his children does not necessarily mean that this was demanding physically, when there is nothing in the record to support that. *See Martinez v. Astrue*, No. 10-5097, 2011 WL 1549517, at *9 (10th Cir. April 26, 2011). Indeed, Mr. Elliott testified that he had problems with heavy lifting in regard to the care of his children. (Tr. 354.) Again, these activities do not necessarily make Mr. Elliott unworthy of belief. *Martinez,* 2011 WL 1549517, at *9.

In short, many of the factors cited by the ALJ to support his credibility finding are not supported in substantial evidence and are not entitled to any deference. Thus, Mr. Elliott's credibility also needs to be reassessed on remand.

III.     CONCLUSION

Based upon the foregoing, I find that the ALJ erred at step three in that he did not properly assess whether Mr. Elliott's impairments met or equaled the Listings. The ALJ also erred by not having medical expert testimony on this issue. I also find that the ALJ erred in assessing certain aspects of Mr. Elliott's RFC and in assessing Mr. Elliott's credibility. Accordingly, this case must be remanded to the Agency for further fact finding on these and the other issues discussed in this Order. It is therefore

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further fact finding pursuant to sentence four in 42 U.S.C. § 405(g).

Dated: September 28, 2011

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge